**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

STEVEN EDELMAN,
     Plaintiff,

     v.

DAVID PAGE, et al.,
     Defendants.

No. 3:00-cv-01166 (JAM)

**RULING RE MOTIONS FOR SUMMARY JUDGMENT**

In June 1998, plaintiff Steven Edelman was seen replacing the shingles on a house he owned in Windham, Connecticut without a permit for the work. This was not the first time plaintiff had worked on a roof without a permit. In fact, he had a history of vehement disagreement with the local building authorities about whether he could work on a roof without a permit, and had already twice been ordered to discontinue such work and obtain a permit. As a result of the incident in 1998, plaintiff was arrested, prosecuted in state court, found guilty by a jury, and sentenced to 90 days in prison. He served three days before the judgment was reversed on appeal because of a procedural trial error. The prosecution was ultimately dropped.

In 2000, plaintiff filed suit in federal court against more than 30 defendants for violating his constitutional rights in connection with this incident. After many procedural twists and turns over the last decade and a half of litigation, just two defendants remain: Donald Schultz, the town Building Official who began the enforcement action, and David Page, a deputy sheriff who attempted to serve plaintiff with a stop work order at Schultz's behest. I now consider their motions for summary judgment (Docs. #250, #251).

BACKGROUND

Plaintiff has a long record of disagreement with officials in the Town of Windham. During the 1990s, he was chairman of the Windham Libertarian Party. He had criticized the Democratic Party's administration of the town, and had allegedly filed a number of Freedom of Information Act requests on the Town of Windham. According to plaintiff, he and his political allies have "engaged in legal disputes" with the Town of Windham, Doc. #154 ¶ 16, and he has allegedly even advocated for dissolving municipal offices and such positions as the Building Official. *See* Doc. #171 at 3.

Defendant Donald Schultz was the Building Official for the Town of Windham from 1991 to 2013. Doc. #255 ¶ 1; Doc. #299 ¶ 1. In November 1993, Schultz observed a worker applying roof covering on a single-family property owned by plaintiff, located at 44 Old Brooklyn Turnpike. Doc. #302-1 at 17. After verifying that there was no building permit in effect for the work, Schultz placarded the structure with a stop work legal notice and mailed a stop work order to plaintiff. *Ibid*; Doc. #299 ¶ 6.[1] Plaintiff and Schultz discussed the issue over the phone the next day, and Schultz reaffirmed that the order was in effect. Doc. #302-1 at 17. That day, plaintiff submitted an application-of-sorts for a permit, in which he included the following protest:

> This structure received a C.O. in or about 1987 despite suffering from numerous code violations. I have remedied these deficiencies which escaped the notice of the building department. I have engaged in NO alteration, addition, or change to the building. I have REPLACED components that should never have required attention had the inspection officer performed his duties in accordance with the law. This job does NOT require a permit.

Doc. #255 ¶ 9; Doc. #299 ¶ 9; Doc. #302-4 at 38 (emphasis in original).

---

[1] Plaintiff disputes the characterization of this and other similar documents as "stop work orders," contending that they do not meet the legal requirements of an enforceable stop work order. *See, e.g.*, Doc. #299 ¶ 6. Purely for ease of reference, I refer to them in this ruling as what they purport to be—stop work orders—and make no finding regarding their compliance with the legal requirements for such orders.

The next day, Schultz observed that the stop work placard had been removed and that work had continued, and Schultz allegedly told plaintiff that he needed to apply for a building permit by December 1, 1993. Doc. #302-1 at 17. On December 1, Schultz filed an affidavit in support of an arrest warrant against plaintiff for working without a permit and for continuing work after having been served with a stop work order. *Ibid.* The arrest warrant was signed by a judge and executed by the Connecticut State Police. Doc. #255 ¶ 12; Doc. #299 ¶ 12. As a result of negotiations between plaintiff's counsel and the prosecutor assigned to the case, the state's attorney agreed in March 1994 not to pursue charges against plaintiff if he applied for a permit (notwithstanding plaintiff's previous protest "application") and paid a late fee. Doc. #255 ¶ 15; Doc. #299 ¶ 15. Plaintiff did so, then Schultz approved the application the next day, and that was the end of the first criminal prosecution against plaintiff for re-roofing. Doc. #255 ¶ 16–17; Doc. #299 ¶ 16–17; Doc. #251-2 at 29.

But that was far from the end of plaintiff's re-roofing troubles. In November 1994, a similar incident ensued. This time, Assistant Building Inspector Curtis Garry informed Schultz that he had seen unauthorized work being performed on the roof of a property owned by plaintiff's father at 264 Scotland Road. Doc. #251-2 at 27. According to a memorandum from Garry to Schultz, Garry and plaintiff spoke at the site, and plaintiff informed him that his father had applied to the state building department for a permit, believing he would not receive fair treatment from the Town of Windham. *Ibid.* Garry soon learned from the state building department that the application had been denied, and he issued a stop work order. *Ibid.* At this point, according to Garry, plaintiff was angry and verbally abusive, threatening him with arrest and civil suit. *Ibid.* Although plaintiff denies this characterization of his behavior, it is undisputed that this characterization was in the memorandum Garry sent to Schultz. *See ibid.*

3

That day, plaintiff filed an application with the town for a building permit for "stripping and reroof[ing]." Doc. #251-2 at 31.[2] The application included as commentary:

> Curtis Garry observed ½ of roof off . . . without shingles. He alleged that someone stripped the roof, a process for which he will not present a witness. He refuses to admit the possibility that recent heavy winds blew off the shingle coverage rolled roofing that previously covered the building. Steven Edelman currently seeks the license revocation of Donald Schultz recognizing Schultz's conflict of interest. Edelman acted in good faith seeking a permit directly from the State. . . . Edelman protests the late fee.

*Ibid.* The application was approved that very day, and no further enforcement with regard to the incident followed.

On the same day in November 1994, plaintiff also filed a written statement notifying the Town of Windham that he and his father would construe any encroachment on their properties by town employees as criminal trespass and would seek prosecution to defend their right to privacy. Doc. #255 ¶ 28; Doc. #299 ¶ 28; Doc. #302-4 at 9. Plaintiff filed a similar statement with the town in January 1996. Doc. #255 ¶¶ 29–30; Doc. #299 ¶¶ 29–30; Doc. #302-4 at 11. In 1995, in the interim between filing those two statements, plaintiff wrote to Windham First Selectman Walter Pawelkiewicz, accusing him of "fail[ing] to provide an alternative to obtaining building permits through a Town of Windham building official," notifying him that plaintiff planned to conduct work in July 1995, and reminding him that "[e]ncroachment by Town of Windham officials on land owned by Marvin Edelman [plaintiff's father] or Steven Edelman constitutes criminal trespass in the first degree." Doc. #302-4 at 10.

Over the first half of 1998, plaintiff engaged in extensive correspondence by letter with at least two state-level officials—Connecticut Public Safety Building Official Daniel Tierney and Connecticut State Building Inspector Christopher Laux—for clarification on the precise

---

[2] Although plaintiff disputes that his building permit application was for "stripping and reroofing," Doc. #299 ¶ 25, the application clearly contains, in the box below "classification," only the handwritten words "stripping and reroof."

4

parameters of various aspects of the state building code and how they might apply to re-roofing work, as well as on the availability of criminal prosecution to enforce the building code. *See, e.g.*, Doc. #302-4 at 25–26, 31–35 (plaintiff asked several questions in February, received a response from Tierney, and followed up with additional questions in May; plaintiff wrote another letter at the same time in May, received a response from Laux, and followed up with more questions in mid-June). In a letter from Tierney to plaintiff in March 1998, Tierney informed him that the State Building Inspector would recommend that a municipal Building Official pursue criminal prosecution "upon establishment of failure to comply with a notification of a violation of the building code." *Id.* at 33. And in a letter from Laux to plaintiff in early June 1998, Laux informed him that "[a] building permit is required for the removal and replacement of 25 percent or less of the roof covering, as it is required for the removal and replacement of over 25 percent of the roof covering. Likewise, the installation of roof covering over existing roofing also requires a building permit." Doc. #302-1 at 5.[3] According to plaintiff, Assistant Building Official Costello visited plaintiff's two-story, single-family property at 217 Scotland Road on June 19, 1998, and informed him that he did not need a permit for re-roofing that property.[4] *See* Doc. #251-3 at 35–36.[5]

Things came to a head for the third time, and with this third property, on June 25, 1998, when plaintiff was replacing the shingles on the roof of 217 Scotland Road. On his way to work early in the morning, Schultz observed plaintiff working on the roof. Schultz arrived at his office, determined that no building permit had been issued for plaintiff's roof work, and issued a stop work order to be served on the property. Around 9 a.m., he ordered Deputy Sheriff David Page

---

[3] As plaintiff notes in his briefing, Laux's letter stated that he assumed the project under discussion was not for a one- or two-family dwelling. Doc. #302-1 at 5.

[4] Plaintiff lived across the street from the 217 Scotland Road property, at 202 Scotland Road, which was not one of the several properties that he apparently re-roofed without obtaining a permit.

[5] The first name of Assistant Building Official Costello is not apparent from the record.

to deliver the order.

Page drove to 217 Scotland Road and placarded the order to the building around 11 a.m. Plaintiff was still on the roof, in the process of "stripping off the old roof and applying a new roof." Doc. #251-3 at 36; Doc. #255 ¶ 68; Doc. #299 ¶ 68. Plaintiff saw Page and quickly came down off the roof because he "did not want someone tacking something to my building." Doc. #251-3 at 39; Doc. #255 ¶ 72; Doc. # 299 ¶ 72. He told Page to remove the placard, and when Page explained that he was there to serve a stop work order, plaintiff said "I don't care why you're here. I want you off the property now." Doc. #251-3 at 39. Although requested multiple times to identify himself, plaintiff refused to do so, believing that he had no obligation and that Page had no authority to be on his property. Instead, he cited the state trespass statute, case law, and the U.S. Constitution to Page "to let him know that he cannot and could not stay there legally," and threatened to call the police if Page did not leave. Doc. #255 ¶¶ 81, 85; Doc. #299 ¶¶ 81, 85. Page backed up and prepared to leave the property.

According to Page, when he looked behind him to reverse his car and drive away, he heard a noise and inferred that plaintiff had kicked the car. *See* Doc. #250-3 at 1 ("I heard something hit my car. I turned back . . . and realized that [plaintiff] had kicked my car."). According to plaintiff, he never kicked the car, and there was no reason for Page to mistakenly believe he had. After Page left, plaintiff phoned the police to request that Page be arrested for trespassing. Doc. #255 ¶ 87; Doc. #299 ¶ 87; Pl.'s Exh. 74 (911 Audio) at 0:48–3:45 (arguing with the 911 dispatcher over whether a deputy sheriff could lawfully serve plaintiff with a legal document without a warrant).

Within the hour, Page allegedly phoned Schultz and told him that plaintiff had been working on the roof when Page arrived, that he had ripped up the stop work order and yelled at

Page, and that he had kicked and dented Page's car. Doc. #251-15 ¶¶ 26–27. Page contends that

he discovered the dent—along with a muddy footprint on his car—while at a restaurant at which

he had stopped after leaving 217 Scotland Road. *See* Doc. #250-4 at 1. Page then left the

restaurant and drove home, where he filled out his return of service for the stop work order and

noted that plaintiff had crumpled up and thrown the stop work order, that he had been verbally

abusive, and that Page believed he had kicked the car. *See* Doc. #251-15 at 32.

Page then met with Schultz and the local housing prosecutor at Windham Town Hall,

where Page delivered the return of service and torn stop work order and told Schultz that plaintiff

had ripped the placard and damaged Page's car. They called the police, and Page reported that

plaintiff had kicked his vehicle. Specifically, Page reported:

> My name is David Page. I'm a deputy sheriff for Windham County. I was
> wondering if you had a trooper in the area. I'm at the Town Hall. I have a
> complaint to make out against somebody who attacked my car, and I'm with the
> building official who's with the state's attorney; we're making out a complaint for
> some other issues, but they suggested that I call you about getting—making a
> complaint. . . . I'm a deputy sheriff for Windham County. . . . [plaintiff] stomped
> my hood. . . . He put a good-sized dent in, left a footprint in the hood.

Pl.'s Exh. 74 (911 Audio) at 5:37–7:50.

Later that day, Page made out a sworn witness statement to Connecticut State Trooper

Donald Aitken. *See* Doc. #250-7 at 1 ("I heard something hit my car. I turned to the front of my

car where Mr. Edelman was standing and realized that he had kicked my car."). By that time, the

alleged muddy footprint had disappeared. Aitken nevertheless determined that probable cause

existed for plaintiff's arrest. *See* Doc. #251-12 at 3 (making his finding based on the sworn

statement of Page, the noted damage to his vehicle, and the copy of the stop work order). He

arrested plaintiff later that day and charged him with criminal mischief in violation of

Connecticut General Statutes § 53a-116.

Plaintiff applied for a building permit the next day and paid a late fee for working without a permit. His application stated that the fee was "paid under duress—no statute or regulation classifies shingle replacement as other than an 'ordinary repair' not requiring a permit—state building official confirmed . . . that payment of $22 fee abated any and all enforcement action." Doc. #251-2 at 48. Three days later, Schultz issued the building permit.

But Schultz did not mention to plaintiff that on the very day of the incident he had already filed an affidavit in support of plaintiff's arrest for the re-roofing work. That affidavit contained information plaintiff contends is false, namely that he continued to work on the house without a permit after the stop work order was served, and that he attacked and damaged Page's car. *See* Doc. #251-15 at 34. In early July 1998, plaintiff was arrested under Connecticut General Statutes § 29-263 for failure to have a permit to construct or alter a building.

In late October 1999, plaintiff was tried by a jury for both criminal mischief and working without a permit. The jury acquitted plaintiff of the criminal mischief charge and found him guilty of unlawfully working without a permit. At sentencing, the trial court judge remarked:

> Sir, it is the determination of the court, after a finding of guilty by a jury of your peers, that you have violated the building code in a flagrant manner in that you were very much aware of the building code, you had sought more opinions than perhaps any other individual in the state of Connecticut, you were given an opinion which indicated to you that you were required to have a permit, you did not obtain a permit, and that you flagrantly disregarded the instructions from the state building inspector in this matter and violated the state building code.

Doc. #251-14 at 4. The judge sentenced plaintiff to a fine of $500 and a period of 90 days in prison. Plaintiff served three of those days before the court set an appeal bond and suspended the remainder of the sentence.

On appeal, the Connecticut Appellate Court reversed the judgment of the trial court because it had failed to poll the jurors individually upon plaintiff's timely request. *State v.*

*Edelman*, 64 Conn. App. 480, 483–84, 780 A.2d 980 (2001). It also denied plaintiff's vagueness challenge to Connecticut General Statutes § 29-263, noting that plaintiff had actual notice of the need for a permit because of his correspondence with the state building inspector. *Id.* at 485. The Connecticut Supreme Court initially granted certification for an appeal, then dismissed it as improvidently granted. *State v. Edelman*, 262 Conn. 392, 815 A.2d 104 (2003) (*per curiam*). The remaining charge against plaintiff for unlawfully working without a permit was ultimately dropped pursuant to an unconditional *nolle prosequi* in 2003.

Following his conviction after trial but before resolution of his appeal, plaintiff brought this federal lawsuit in 2000 against Page, Schultz, and approximately 30 other employees or agents of the Town of Windham. In the 15 years since then, the case has amassed a lengthy and complex procedural history (most of which occurred before the case was transferred to my docket in 2014). In 2001, the Court dismissed the case and denied plaintiff's motion to reopen it because of plaintiff's pending criminal appeal. Doc. #65 and Endorsement (Aug. 27, 2001). In 2004, the Court denied as untimely plaintiff's new motions to reopen the case and motion for reconsideration of his decision. Docs. #74, #80. An appeal followed, and in 2008 the Second Circuit vacated the Court's 2004 decision denying plaintiff's motion for reconsideration and remanded the case back to the Court for further consideration. Doc. #99. The Court then granted plaintiff's new, unopposed motion for reconsideration and reopened the case. Doc. #104.

In July 2009, plaintiff filed his second amended complaint (the operative complaint), suing Page, Schultz, and five other Windham officials for malicious prosecution, false arrest, denial of due process, and denial of equal protection of the law in connection with his arrests and prosecution. *See* Doc. #154.

All defendants except Page moved for judgment on the pleadings, and in April 2011, the

Court granted judgment in favor of the moving defendants on all claims against them except for a claim that Schultz violated plaintiff's right to equal protection of the law by engaging in selective enforcement or unlawfully treating plaintiff as a class of one. Doc. #171 at 55.

A lengthy discovery period followed, and in March 2013 the Court denied without prejudice motions for summary judgment filed by Page and Schultz, in order to allow plaintiff to conduct additional discovery. *See* Docs. #243–#245. In late June 2013, Page and Schultz filed renewed motions for summary judgment. Docs. #250, #251. The exhibits to be filed alongside plaintiff's opposition to the motions were themselves the subject of extended dispute, and briefing continued into August 2014.[6] At that time, the Court heard oral argument on the summary judgment motions and denied a new, untimely motion by plaintiff to amend his complaint. *See* Docs. #317, #320.

I now consider the 2013 motions for summary judgment filed by Page and Schultz. *See* Docs. #250, #251. For the reasons set forth below, Schultz's motion is granted, and Page's motion is granted in part and denied in part.

---

[6] In September 2013, the Court ordered plaintiff to justify his stated need to file approximately 2,000 pages of attachments to his opposition to summary judgment. Doc. #266. Plaintiff responded to the Court, and Page opposed plaintiff's statement. The Court then gave plaintiff an opportunity to respond to Page's opposition, and allowed Schultz to respond to plaintiff's statement regarding the need for all his exhibits. Doc. #270. In November 2013, the Court issued an order limiting plaintiff from filing many of his intended exhibits (including, *inter alia*, approximately 500 pages of language from building code treatises, which the Court found irrelevant to the remaining equal protection claim against Schultz and the claims against Page stemming from the criminal mischief charge). *See* Doc. #273 at 1–2. The Court also directed plaintiff to file an amended statement of intended exhibits. *Id*. at 2–3. The Court subsequently denied plaintiff's motion for reconsideration, reiterating that the claims against Page related only to the criminal mischief charge against plaintiff. Doc. #277 at 3–4. Plaintiff then filed his amended statement of intended exhibits in early 2014, and the Court issued an order finding that the statement failed to comply with previous orders and admonishing plaintiff for attempting to relitigate issues that had been previously decided. Doc. #281 at 2–4. After that order, plaintiff filed another amended statement, Doc. #282, and this time the Court set a schedule for the remainder of briefing on summary judgment, stating that it would determine the relevance of plaintiff's exhibits when ruling on the summary judgment motions. Doc. #286. Defendants continue to object to large swaths of plaintiff's most recent list of exhibits.

**DISCUSSION**

The principles governing a motion for summary judgment are well established. Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*). "A genuine dispute of material fact 'exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor.'" *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)). The evidence adduced at the summary judgment stage must be viewed in the light most favorable to the non-moving party and with all ambiguities and reasonable inferences drawn against the moving party. *See, e.g.*, *Tolan*, 134 S. Ct. at 1866; *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). All in all, "a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan*, 134 S. Ct. at 1866 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

**Schultz's Motion for Summary Judgment**

The only remaining claim against Schultz is that he violated plaintiff's right to equal protection of the laws when he pursued criminal charges against plaintiff for working on the roof of 217 Scotland Road without a permit. *See* Doc. #171 at 45, 55. The Court previously held that the equal protection claim against Schultz could proceed under a theory of selective enforcement or as a class-of-one claim, and that Schultz was not entitled at the pleading stage to qualified immunity for his actions. *Id.* at 46 (selective enforcement), 52 (class-of-one), 54 (Schultz not entitled to qualified immunity).

11

Claims of selective enforcement and class-of-one discrimination are closely related, though analytically distinct in this Circuit. Both rely on the Equal Protection Clause of the Fourteenth Amendment, which "requires that the government treat all similarly situated people alike." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).

A claim of selective enforcement or selective prosecution arises when the government seeks to apply the law to a plaintiff differently than it would to other similarly situated individuals, for constitutionally impermissible reasons. To prevail on such a claim, a plaintiff must prove that:

> (1) the [plaintiff], compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

*Brown v. City of Syracuse*, 673 F.3d 141, 151–52 (2d Cir. 2012) (alteration in original) (internal quotation marks and citation omitted).

The Court previously held that the selective enforcement claim against Schultz could proceed insofar as it alleged that plaintiff's arrest in 1998 constituted differential treatment from the "hundreds of other residents in the Town of Windham who performed construction work without a permit" and were only required to pay a late fee, Doc. #171 at 41, and that the differential treatment was based on an impermissible intent to inhibit or punish the exercise of plaintiff's First Amendment rights in vocally criticizing the political establishment of Windham, or on malicious or bad faith intent to injure plaintiff. *Id.* at 44–45. On the other hand, the Court found that plaintiff had not sufficiently alleged facts to support a claim that he was treated differently on account of membership in a protected class, either because of his political affiliation or because he was a Levite Jew. *Id.* at 41–43.

The degree of comparator similarity required for a selective enforcement claim has been the subject of some disagreement among courts within this Circuit. *See Silano v. Wheeler*, 2015 WL 477179, at *10 (D. Conn. 2015). Some courts have required the level of similarity between a plaintiff and his would-be comparators to be "extremely high." *See, e.g.*, *Peterec v. City of New York*, 2015 WL 1027367, at *5 (S.D.N.Y. 2015) (internal quotation marks and citation omitted). Others have adopted a less rigorous standard, requiring only "'a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases,' to the extent that an 'objectively identifiable basis for comparability exists.'" *See Norton v. Town of Brookhaven*, 33 F. Supp. 3d 215, 239 (E.D.N.Y.) (quoting, *inter alia*, *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)), *on reconsideration on other grounds*, -- F. Supp. 3d --, 2014 WL 4700250 (E.D.N.Y. 2014).

At a minimum, a plaintiff must show that he and his comparators "are similarly situated in all material respects, or that a prudent person looking objectively at the incidents would think them roughly equivalent." *Silano*, 2015 WL 477179, at *10 (internal quotation marks and citation omitted). Furthermore, he must show that "[d]efendants knew there were similarly situated individuals and consciously applied a different standard to plaintiff." *Peterec*, 2015 WL 1027367, at *5 (internal quotation marks and citation omitted).

Generally, whether people are similarly situated is a factual issue for a jury to resolve, but this rule is not absolute, and summary judgment may be granted if it is clear that no reasonable jury could find that the plaintiff was similarly situated to others who were accorded more favorable treatment. *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790–91 (2d Cir. 2007). Here, I conclude that no reasonable jury could find that plaintiff was similarly situated in all material respects to any others who engaged in similar conduct known to Schultz but who were

not subject to a referral for criminal prosecution. To be sure, so far as this record reflects, plaintiff is the only person in Windham to have been criminally prosecuted for building without a permit. But plaintiff provides no specific information regarding the circumstances surrounding any of his would-be comparators, other than that they paid late fees for permits to conduct perhaps similar work (although how similar remains unknown). The most promisingly similar comparators he points to are 19 individuals who paid two late fees and nine individuals who paid three or more late fees for permits to do work involving roofing. But without any more specific information about those individuals, I cannot conclude that a reasonable jury could find that plaintiff was similarly situated to them in "all material respects" and that he was treated differently from them in "roughly equivalent" scenarios. *Silano*, 2015 WL 477179, at *10 (internal quotation marks and citation omitted).

After all, the situation presented to Schultz in June 1998 was seemingly unique. Here was a repeat offender of unauthorized re-roofing who had adamantly refused on at least two prior occasions to concede that he might lawfully need a permit for re-roofing work. As far as Schultz knew at the time, plaintiff had repeatedly behaved extremely aggressively, even abusively, toward those officials who presented stop work orders and informed plaintiff that he needed a permit. Such scenes were described to Schultz in detail by Garry in 1994 and by Page in 1998. And this time, Schultz was also told that plaintiff had ripped up the stop work order—a gesture that, in conjunction with plaintiff's prior conduct, suggested that plaintiff did not intend to comply with the law—and that plaintiff had attacked Page's car in anger over the demand that he cease his permit-less work.

Fifteen years into the litigation of this case, plaintiff has not identified a single comparator to whom a jury could find that he was similarly situated in all material respects, in

14

terms of his past history of noncompliance or his behavior when confronted with an order to cease work and obtain a permit.[7] Even though it is undeniable that plaintiff was the only person who was subject to criminal prosecution for his roofing activity, that fact is not enough on its own to sustain his claim, where no evidence shows that Schultz dealt with others who had engaged in the same kind of conduct as plaintiff but treated them more favorably. Without such evidence, plaintiff cannot succeed on his selective enforcement claim.[8] I will therefore grant summary judgment in favor of Schultz on this claim.

Closely related to selective enforcement claims are class-of-one claims, which arise when a plaintiff was "intentionally treated differently from others similarly situated and . . . there is no rational basis for the difference in treatment." *Fortress Bible Church v. Feiner*, 694 F.3d 208, 222 (2d Cir. 2012) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (*per curiam*)).[9] In order to prevail on a class-of-one claim, the degree of similarity between a plaintiff and those with whom he seeks to compare himself must be "extremely high," such that the existence of those favorably treated comparators can "provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate

[7] This is not to mention the fact that plaintiff went out of his way to thoroughly educate himself about the building code requirements for re-roofing work, making him far more knowledgeable than any of his comparators would presumably be. But because it has not been established that Schultz was aware of plaintiff's extensive research efforts, I do not consider whether this fact distinguished plaintiff from his comparators when Schultz decided to pursue plaintiff's arrest.

[8] The Court recognizes that there were some limitations on plaintiff's ability to access some of the comparator information he needed, because Windham has apparently lost numerous building permit receipts for a period of over ten years and did not record stop work orders until 2007. But it is plaintiff's responsibility to identify similarly situated others who were treated more favorably than he was, if he is to prevail on a selective enforcement claim. *See, e.g.*, *S.E.C. v. Sirianni*, 334 F. App'x 386, 389 (2d Cir. 2009); *Davis v. City of New Haven*, 2014 WL 1315660, at *7 (D. Conn. 2014). He has had an extraordinary amount of time to investigate the circumstances surrounding, for example, the 19 individuals who paid two late fees or the nine individuals who paid three or more late fees for permits to do work involving roofing. The difficulty of conducting such an investigation does not absolve plaintiff of his burden of production.

[9] The Supreme Court has arguably added a third requirement to class-of-one claims: that the offending governmental action at issue be nondiscretionary. *See Ruston v. Town Bd. for the Town of Skaneateles*, 610 F.3d 55, 58 n.3 (2d Cir. 2010) (citing *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591 (2008)). Because I find that plaintiff's claim fails for lack of evidence as to similarly situated comparators, I need not address whether Schultz engaged in discretionary action when he instigated the prosecution against plaintiff.

government policy that an improper purpose—whether personal or otherwise—is all but certain."
*Neilson v. D'Angelis*, 409 F.3d 100, 104–05 (2d Cir. 2005), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008). Thus, a class-of-one plaintiff must show that the comparators' circumstances were "prima facie identical" to his, *id.* at 105, by demonstrating that:

> (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake.

*Ruston v. Town Bd. for the Town of Skaneateles*, 610 F.3d 55, 60 (2d Cir. 2010).

This is a higher standard than I applied above to plaintiff's comparator evidence with regard to his selective enforcement claim, and plaintiff's evidence is again insufficient to withstand summary judgment. Plaintiff's only offering is still that there were a number of other Windham residents who paid late fees for permits to fix roofs, and who were not arrested or prosecuted for their initial failure to procure the necessary permits. But plaintiff provides no information that could lead a reasonable jury to find that these comparators' circumstances were "prima facie identical" to his, such that no rational person could regard any differences between them as legitimately justifying the differential treatment plaintiff received. *Ibid*; *Neilson*, 409 F.3d at 104–05.

In short, Schultz is entitled to summary judgment on the class-of-one claim for the same reasons as for the selective enforcement claim. My ruling does not mean that it was appropriate for Schultz to act as he did toward plaintiff or that the criminal prosecution of plaintiff for replacing shingles without a permit was a sound exercise of prosecutorial discretion. I conclude only that the evidence falls short of showing a genuine issue of fact to sustain a claim that Schultz's conduct amounted to a violation of the Equal Protection Clause.

16

**Page's Motion for Summary Judgment**

The only claims remaining against defendant Page are constitutional claims for false arrest, malicious prosecution, denial of due process, and denial of equal protection on the basis of Page's contributions to plaintiff's arrest and prosecution for criminal mischief. *See* Doc. #273 at 1; Doc. #281 at 1. As the Court stated during oral argument on the motions for summary judgment, the operative complaint does not allege defamation and either negligent or intentional infliction of emotional distress.[10]

Because constitutional claims are brought pursuant to 42 U.S.C. § 1983, I must first address a threshold question for liability under § 1983: whether Page acted under color of law when he reported that plaintiff had kicked his car. "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic,*

---

[10] Even if plaintiff's complaint were construed to allege such claims, those claims would fail as a matter of law. The only portion of the complaint that could ostensibly allege defamation states that "[d]espite the plaintiff's exoneration of the § 53a-116 criminal mischief charge, Defendant Page, in a February 8, 2000 Associated Press article, stated that the plaintiff damaged Defendant Page's vehicle." Doc. #154 ¶ 45. In Connecticut, "[t]o establish a prima facie case of defamation, the plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." *Cweklinsky v. Mobil Chem. Co.*, 267 Conn. 210, 217, 837 A.2d 759 (2004). None of plaintiff's filings at the summary judgment stage mention anything about what was said to the reporter. The statement that was published consisted merely of "Page, 52, has been spat on. The hood of his car has been bashed." Doc. #308-15 at 2. There was no identification of plaintiff, nor an accusation that he was in any way involved in the damage to Page's car. Thus, even if plaintiff's complaint did state a claim for defamation, based on the undisputed facts, he cannot establish a *prima facie* case of defamation, and Page would be entitled to summary judgment on this claim. As for emotional distress, plaintiff's complaint alleges only that "[a]s a direct and proximate result of the acts and omissions herein described, the plaintiff suffered humiliation, emotional distress, physical affliction and the loss of such Constitutional rights as to be free from malicious prosecution." Doc. #154 ¶ 49. In his opposition to summary judgment, plaintiff provides no evidence of any emotional distress allegedly suffered by plaintiff—unsurprisingly a requirement to prevail on a claim of either intentional or negligent infliction of emotional distress. *See Gillians v. Vivanco-Small*, 128 Conn. App. 207, 211, 15 A.3d 1200 (2011) (to prevail on a claim of intentional infliction of emotional distress, plaintiff must prove, *inter alia*, severe emotional distress); *Olson v. Bristol-Burlington Health Dist.*, 87 Conn. App. 1, 5, 863 A.2d 748 (2005) (to prevail on a claim of negligent infliction of emotional distress, plaintiff must prove, *inter alia*, emotional distress "severe enough that it might result in illness or bodily harm"). Page would therefore be entitled to summary judgment on any claim against him for emotional distress, as well.

313 U.S. 299, 326 (1941)). Even when a private person acts, he may do so under color of state law for purposes of § 1983 if "(1) the State compelled the conduct [the 'compulsion test'], (2) there is a sufficiently close nexus between the State and the private conduct [the 'close nexus test' or 'joint action test'], or (3) the private conduct consisted of activity that has traditionally been the exclusive prerogative of the State [the 'public function test']." *McGugan v. Aldana-Bernier*, 752 F.3d 224, 229 (2d Cir. 2014) (alterations in original) (internal quotation marks and citation omitted).

Page delivered the stop work order in his capacity as a deputy sheriff and at the behest of another public official (Schultz). Taking the facts in the light most favorable to plaintiff, as I must, there is at least a question of fact that he subsequently called and spoke to the police in the same capacity. He made a point to state multiple times on the phone that he was a deputy sheriff and was with the Building Official and state's attorney, preparing to make a complaint on other grounds. Pl.'s Exh. 74 (911 Audio) at 5:40–5:56. And while Connecticut State Trooper Aitken treated him simply as a "complainant/victim" when taking his written statement, Aitken mentioned Page's job title four times in two pages, a fact which might lead a reasonable jury to believe that Page acted in his official capacity to boost his credibility reporting the incident. *See* Doc. #251-12 at 2–3. Though Page certainly did not have to be a state actor to report that someone kicked his car, a reasonable jury could infer from his conduct that Page chose to use his status as a public officer to make his complaint. There is no compelling evidence in the record that suggests that Page acted as anything other than deputy sheriff so as to preclude liability under § 1983.

Having concluded that there is at least a question as to whether Page acted under color of state law, I turn first to plaintiff's false arrest and malicious prosecution claims. "Claims for false

arrest or malicious prosecution, brought under § 1983 to vindicate the Fourth and Fourteenth

Amendment right to be free from unreasonable seizures, are substantially the same as claims for

false arrest or malicious prosecution under state law." *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d

Cir. 2003) (internal quotation marks and citations omitted). False arrest is "the unlawful restraint

by one person of the physical liberty of another." *Schofield v. Magrey*, 2015 WL 521418, at *2

n.4 (D. Conn. 2015) (quoting *Green v. Donroe*, 186 Conn. 265, 267, 440 A.2d 973 (1982)). In

order to prevail on a claim of false arrest, a plaintiff must show that "(1) the defendant

intentionally arrested him or had him arrested; (2) the plaintiff was aware of the arrest; (3) there

was no consent to the arrest; and (4) the arrest was not supported by probable cause." *Sharnick v.

D'Archangelo*, 935 F. Supp. 2d 436, 443 (D. Conn. 2013) (internal quotation marks and citation

omitted).

Plaintiff's false arrest claim against Page for making an allegedly false complaint against

plaintiff fails at the first step of the analysis. "A person is not liable for false imprisonment unless

his act is done for the purpose of imposing a confinement, or with knowledge that such

confinement will, to a substantial certainty, result from it." *Green*, 186 Conn. at 268; *see also*

Restatement (Second) of Torts § 35 & cmt. d (1961). The Second Circuit has held that a claim of

false arrest could not stand against a police officer whose only official action was to call in a

complaint to dispatch, after which more senior officers appeared, investigated, and made the

ultimate decision to detain a plaintiff:

> Here, the record is clear that [the defendant officer] never directly detained [the
> plaintiff] and lacked the authority to steer the investigation to such an end.
> Though [he] stated that he reported the incident pursuant to his duties as a police
> officer, there is no evidence that any official involvement of [the officer]
> continued after this point. Indeed, once [he] called in the complaint to dispatch,
> the record is undisputed that other more senior officers appeared on the scene;
> conducted the investigation, treating [him] as a witness; and ultimately made the
> decision to detain [the plaintiff].

*Martinsky v. City of Bridgeport*, 504 F. App'x 43, 46–47 (2d Cir. 2012) (internal citations omitted).

In the instant case, there is similarly no evidence that Page restrained plaintiff's physical liberty while on plaintiff's property, and his only official acts consisted of his allegedly false reports that plaintiff had kicked and damaged his car. Aitken mentioned several times in his report that Page was a deputy sheriff, but treated him as a witness and victim for purposes of his report and probable cause finding. *See* Doc. #251-12 at 2–3. Plaintiff argues that, "[b]y falsely accusing Edelman of damaging his car, Page acted with the knowledge that a fellow peace officer would likely arrest Edelman." Doc. #296 at 24. But knowledge that an unlawful arrest is "likely" is not nearly enough; in order to be liable for false arrest, Page must have acted with knowledge that that the false arrest would, "to a substantial certainty," result from his report. *Green*, 186 Conn. at 268; Restatement (Second) of Torts § 35 cmt. d (1961). No evidence in the record suggests that Page could have had such certain knowledge, or that he had any authority to "steer the investigation" to detain plaintiff. *See Martinsky*, 504 F. App'x at 47. On the contrary, although Page may have reported the alleged crime in his official capacity, from that point onward, a police officer conducted the investigation, made a probable cause determination, and decided to arrest plaintiff. No reasonable jury could find that Page's alleged actions rendered him liable for false arrest. I therefore grant Page's motion for summary judgment as to this claim.

Plaintiff's claim against Page sounds more in malicious prosecution than in false arrest. To prevail on a claim of malicious prosecution, plaintiff must prove that that he was subject to a post-arraignment, Fourth Amendment seizure and that "(1) the defendant initiated or continued criminal proceedings against the plaintiff; (2) the criminal proceeding terminated in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the defendant acted with

malice." *Roberts v. Babkiewicz*, 582 F.3d 418, 420 (2d Cir. 2009) (*per curiam*) (internal

quotation marks and citation omitted).

Plaintiff was handcuffed and temporarily detained for the charge of criminal mischief and

was required to attend several court proceedings before his weeklong criminal trial. Such

restraints on his liberty suffice to establish a seizure within the meaning of the Fourth

Amendment for purposes of his malicious prosecution claim against Page. *See Swartz v. Insogna*,

704 F.3d 105, 112 (2d Cir. 2013).

At least a genuine issue of fact exists for each of the four remaining requirements for a

malicious prosecution claim. First, the evidence suffices to allow the jury to determine if plaintiff

"initiated" the proceedings. "'A person is deemed to have initiated a proceeding if his direction

or request, or pressure of any kind by him, was the determining factor in the officer's decision to

commence the prosecution . . . [or] the defendant's request might reasonably have been found to

be the proximate and efficient cause of the arrest.'" *Acevedo v. Sklarz*, 553 F. Supp. 2d 164, 172

(D. Conn. 2008) (alterations in original) (quoting *Zenik v. O'Brien*, 137 Conn. 592, 596, 79 A.2d

769 (1951)). A jury could conclude that Page initiated the criminal proceedings against plaintiff

when he reported the allegedly false information to the police. *See Swartz*, 704 F.3d at 112

(defendant police officer commenced a criminal action when he swore out a criminal complaint

against a plaintiff); *Acevedo*, 553 F. Supp. 2d at 172 (malicious prosecution liability can arise

even for a private citizen if he provides knowingly false information to the police).

Second, a jury could conclude that the favorable-termination requirement is met. The

evidence here shows that plaintiff was acquitted of the criminal mischief charge that Page

allegedly initiated against him.

Third, there is a genuine issue of fact whether Page had probable cause (or, for purposes

21

of a qualified immunity defense, even arguable probable cause) to support his allegations that led to the criminal mischief prosecution. *See, e.g.*, *Stansbury v. Wertman*, 721 F.3d 84, 89 & n.3, 94–95 (2d Cir. 2013). Page contends that he heard a noise outside the car, turned forward, saw plaintiff, and inferred that plaintiff had kicked his car. His sworn statement to Connecticut State Trooper Aitken, Doc. #250-7 at 1, his return of service, Doc. #251-15 at 32, and his trial testimony, Doc. #250-4 at 1, are all careful not to say that Page actually *saw* plaintiff kick the car, only that he *realized* plaintiff had kicked the car, based on a loud sound accompanied by plaintiff's presence in front of the car, and on his alleged discovery of a muddy footprint left on the hood of the car. His initial report to the police when he called 911 asserted that plaintiff "attacked" the car, "stomped [the] hood," and "put a good-sized dent in, left a footprint in the hood." Pl.'s Exh. 74 (911 Audio) at 5:37–7:50. Still, the muddy footprint Page claimed he saw on his hood had disappeared by the time he showed Aitken the dent while giving his witness statement, and Page allegedly told Aitken he had cleaned it off—a curious thing for a deputy sheriff to do before meeting with a police officer to provide evidence in support of a criminal arrest. *See* Doc. #305-5 at 10.

Meanwhile, plaintiff has consistently claimed that he never kicked the car, that Page's whole report of the alleged stomping was fabricated, and that there was no factual basis to believe that Page had heard the sound or seen the footprint at all. Taking the facts in the light most favorable to plaintiff, whether there was even arguable probable cause for Page's report is a question for a jury. *See Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997) ("Where there is a dispute as to the pertinent events, the existence *vel non* of probable cause is to be decided by the jury."); *see also Crocco v. Advance Stores Co.*, 421 F. Supp. 2d 485, 502 (D. Conn. 2006) (denying summary judgment for malicious prosecution claim where genuine issue of fact that

defendants did not believe the information they reported to police).

Lastly, a genuine issue of fact remains as to malice. Malice involves acting "primarily for a purpose other than that of bringing an offender to justice." *Simms v. Seaman*, 308 Conn. 523, 542, 69 A.3d 880 (2013) (internal quotation marks and citation omitted). A lack of probable cause itself can support an inference of malice. *See Mulligan v. Rioux*, 229 Conn. 716, 746, 643 A.2d 1226 (1994) ("If the evidence supports the former [a lack of probable cause], we need not consider the latter [malice], since it may be inferred." (internal quotation marks and citation omitted)); *Crocco*, 421 F. Supp. 2d at 502 (same). Furthermore, a jury might circumstantially infer malice from Page's delay in reporting the incident until after meeting with Schultz and the state's attorney at the Town Hall.

In short, genuine issues of fact remain as to plaintiff's claim of malicious prosecution against Page. Accordingly, Page's motion for summary judgment will be denied as to this claim. Of course, the fact that I conclude that a jury should decide the malicious prosecution claim against Page does not mean that I view plaintiff's case to be strong or believe that a jury will likely rule in plaintiff's favor.

Plaintiff's remaining claims against Page for the denial of due process and equal protection are without merit. The right to procedural process under the Fourteenth Amendment protects against the deprivation of certain interests in the absence of due process of the law. U.S. Const. amend. XVI, § 1 ("No state shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."). Not only does it make little sense to lodge a claim against Page for denying plaintiff procedural due process (given that Page had no input in the process afforded plaintiff during the criminal proceeding), but it is also especially difficult to argue that plaintiff did not receive appropriate process as to the criminal mischief prosecution when he was,

after all, afforded a trial and acquitted of that charge.

As for any claim under the right to substantive due process, "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion) (some internal quotation marks omitted) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). As counsel acknowledged at oral argument, the due process claim against Page rests on the same facts as the malicious prosecution and false arrest claims and sounds in the rights guaranteed by the Fourth Amendment. Because the Fourth Amendment provides a more explicit textual source of constitutional protection for plaintiff's claims of false arrest and malicious prosecution, *see Jocks*, 316 F.3d at 134, I do not address plaintiff's claim under substantive due process analysis. *See Russo v. City of Bridgeport*, 479 F.3d 196, 209 (2d Cir. 2007).

Lastly, plaintiff's equal protection claim against Page fails for the same reasons as against Schultz. Plaintiff argues that "Page, entirely without legal justification, treated [plaintiff] differently from everybody else." Doc. #296 at 36. But without a single piece of evidence to support that contention—that is, evidence about anyone from the "everybody else" that Page allegedly treated more favorably—no reasonable jury could find that Page violated plaintiff's equal protection rights. Page is entitled to summary judgment on the claims against him for denying plaintiff due process and equal protection of the laws.

## CONCLUSION

Schultz's motion for summary judgment (Doc. #251) is GRANTED, and judgment shall enter in his favor on all remaining claims against him. The Clerk of Court shall dismiss Donald

Schultz as a defendant in this case. Page's motion for summary judgment (Doc. #250) is GRANTED as to the claims of false arrest, denial of due process, and denial of equal protection of the laws, and DENIED as to the claim of malicious prosecution.

It is so ordered.

Dated at Bridgeport this 25th day of March 2015.


/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge